IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE EASTERN DISTRICT OF VIRGINIA


UNITED STATES OF AMERICA      )
          )
        v.         )
          )     Docket No.: 2:16cr137
BRUCE LEE SCOTT,        )
          )
      Defendant.     )


## DEFENDANT'S POSITION WITH RESPECT TO SENTENCING FACTORS

The Defendant, Bruce Lee Scott by counsel, in accordance with Rule 32 of the Federal Rules of Criminal Procedure, Section 6A1.2 of the Sentencing Guidelines and Policy Statements, as well as this Court's sentencing Order, hereby represents that he has reviewed the Probation Office's Pre-Sentence Report. He has no objections to the report.

## THE SENTENCE REQUESTED

Mr. Scott will be asking for a sentence of fifteen years, the mandatory minimum in this case. He has led a tragic life, replete with abuse and one in which was severely lacking in consistent and positive role models. This complex past is outlined in great detail in the report by Dr. Jennifer L. Marshall.[1] As this Court will see, this history has undoubtedly shaped his trajectory thus far in life, however, his unique self-reflection, honesty, and desire for help will shape his future. For all of the reasons stated herein, the lengthy sentence of fifteen years is sufficient, but not greater than necessary to meet the goals of 18 U.S.C. § 3553(a).

---

[1] Jennifer L.Marshall, Ph.D. of Woodbridge Psychological Associates, P.C., conducted a forensic mental health evaluation of Mr. Scott at the request of the Federal Public Defender's Office. Dr. Marshall has prepared an 11-page report setting forth her methods and opinions. Dr. Marshall's curriculum vitae is attached here as Exhibit A. Dr. Marshall's report—which contains sensitive information related to Mr. Scott's mental health—will be submitted separately under seal.

## History and Characteristics

Mr. Scott is 30 years of age. He is the second of three children born to Ramon Scott and Wendy Monroe. Wendy Monroe became a mother of three at a very young age; she had all three of these children by the time she was nineteen years old. Bruce was raised by both parents until age two when his parents divorced. When Bruce was four or five years old, Ms. Monroe married Calvin Brown.

Abuse permeated his family for the years that Mr. Brown and his mother were married and living together. At approximately five or six, Bruce was sexually abused by Calvin Brown's teenage nephew, who forced Bruce to perform oral sex on him. He endured this trauma multiple times for approximately one year. Bruce's stepfather sexually abused (and was later convicted for abusing) Bruce's two sisters, Jessica Scott and Elizabeth Carter. His mother walked in on this abuse and reported him to Child Protective Services. He is now a registered sex offender. (Marshall Report, 3).

His mother also had other boyfriends who treated Bruce and Scott poorly. For example, one "stepfather" named Maurice Gilbert's used to utilize humiliation as a parenting tool. Bruce recalls liking to play "dress-up" with this sisters when he very young. On one date, Mr. Gilbert found him dressed like a girl and in make-up and forced him to stand outside of their home and state his name and that he liked to dress up like girls to all of the neighbors who walked by him. (Marshall Report, 2). He also punished his sister for bed-wetting by making her sit on the toilet for hours. (Id.) This toxic environment ended after a few years, however the scars it produced did not.

When Bruce was 10 years old, his mother married Charles Monroe, who Bruce describes as "uninvolved" in his life. He recalls "tensions flaring" at home, but records reveal a more serious situation which concluded in Bruce attempting suicide by choking himself with a belt at age 12.

(Id.) In response, Bruce was placed in Brynn Marr Hospital, a psychiatric hospital for children, a week later. (Marshall Report, 3 and 4).  While in treatment, he was placed on medication for bi-polar disorder and attention deficit hyperactivity disorder (ADHD), acknowledging the presence of serious mental illnesses at a very young age. Records also revealed Bruce was experiencing domestic violence in the home. (Id.). After a month-long stay at Brynn Marr, he returned home, however, he was quickly placed back in a psychiatric inpatient facility. (Id.)  At that time he was diagnosed with a chronic mood disorder called Cyclothymic Disorder, and it was recommended that he be monitored for bi-polar disorder given a reported family history and receive intensive outpatient treatment. (Id.)

Instead of pursuing this obviously wise course of action, twelve-year-old Bruce was sent to live with his father in Virginia, who had gained full custody of him at that time. Refusing to recognize that Bruce had *any* mental health issues, his father took him off the medications and discontinued outpatient therapy. (Id., 2 and 5) Not surprisingly, things did not get better for Bruce living with his father.  He describes a general lack of interest and support by his dad, frequent fights, and even physical altercations in their five years together.  In a shocking display of betrayal when Bruce was 25 years-old, he learned that his father was having sexual relations with one of his girlfriends. This act further fueled his feelings of betrayal, loneliness, and anger.

Bruce was forced to leave his father's home, but luckily was taken in by his grandparents at age 17. In an attempt to gain a sense of structure and pride in his life, Bruce joined the United States Marine Corps at eighteen. Bruce was extremely proud of his accomplishments, as was his family.   The picture below was a t-shirt the family made for his recruit graduation as well as the brochure.



Unfortunately, Bruce was unable to put his past behind him and adjust to life in the military, so he was honorably discharged in 2006. Since his discharge, he has worked a number of jobs, seemingly searching for something more permanent of which he can be proud.

The PSR reflects a person who has not held steady long-term employment, but it is clear he has a variety of skills and most importantly, a strong desire to work. Bruce has indicated an interest in becoming certified in a vocational trade, such as home improvement. Character letters from his grandparents describe a gift for, and interest in, automobile repair. They both describe him as resourceful, loyal, generous, and determined.[2] His uncle Tim says that Bruce excels in landscaping, auto mechanics, and various sorts of home maintenance and repair.[3]

Despite what he has been through, and the loneliness and pain he feels, his family and friends describe him as a kind, generous, and loving person who cares about everyone. They

[2] See Character letters from Earl and Cheryl Bolte
[3] See Character letter from Tim Bolte

describe a person who would sacrifice his time and money to help his grand-parents move, fix their cars, and make sure that the strangers who bought yard equipment at their yard sale had tune-up kits so they would not have problems with the items they had purchased.[4] They also describe a resourceful young boy, starting his own landscaping business at age 10. This would be an impressive feat for any ten year-old, but considering what he had been through, and was still enduring at that time in his life, it is all the more impressive.

His mother, Wendy Monroe, now a social worker, reflects back on her son's upbringing and the role she played in the good and the bad parts of it.[5] She acknowledges that at times she was not a good role-model as a mother and is "sorrowful regarding the undue stress, conflict, and emotional wounds that my choices have imparted on Bruce."[6]

She also outlines what a kind and loving man Bruce is, despite the underlying pain it is clear he still feels. She states that "he has encountered many obstacles in life," but "yet he has always been loving, compassionate, humble, forgiving, supportive, generous, gracious, merciful and optimistic." [7] She states he is well-liked by practically everyone he meets and is extremely sociable"[8] The other character letters which have been received by counsel echo these same sentiments.[9]

The first thirty-years of Bruce's life have had few bright moments, but there is reason for hope and optimism with his future. Unlike a lot of people in his situation, Bruce has a great deal of reflection, desire for help, and a dedication to changing his past behaviors. One rare and important theme that permeates all of the character letters is the remorse and acceptance of

---

[4] See Character letter by Earl Bolte, 2.
[5] See Character letter from Wendy Monroe
[6] See Character letter from Wendy Monroe, 2.
[7] Id, 1.
[8] Id.
[9] See Character letters by Rodney Jones, Cassandra Terrell, Melissa and Jerry Creekmore, and Maurice Scott.

responsibility Bruce has expressed to everyone.  He has not shied away from discussing his current

offense and his shame and desire for help. His sincerity, openness, and honesty has impressed his

family.  Dr. Marshall even called it "noteworthy" from a clinical perspective:

> Mr. Scott was also administered the Personality Assessment
> Inventory (PAI).  His response style yielded a valid profile. It is
> noteworthy that his response style revealed that he was rather open
> and forthright in acknowledging several issues and difficulties,
> rather than responding from a defensive posture. **In the context of
> forensic evaluations a profile with significant defensives is not
> uncommon, thus Mr. Scott's seemingly open self-appraisal is
> noteworthy.**

(Marshall Report, 7, emphasis added).

Additionally, on the Paulhus Deception Scales test, Mr. Scott test scores revealed he was

more than willing to discuss his difficulties and admit to "unflaterring aspects of himself and his

past," unlike many people who are administered this test. Dr. Marshall writes:

> Mr. Scott's responses on the PDS yielded a profile suggesting that
> he is aware of his difficulties and his responses are likely not unduly
> influenced by what others think of him.  His response style further
> suggests that his responses on self-report inventories tend to be
> blunt, honest and valid.  His scores were compared to normative
> samples in both the general population and against a normative
> ample of prison entrants. Hs scores were low when compared
> against both normative groups.  His profile did not yield data
> suggesting that he was attempting to engage in dissimulation. This
> finding is consistent with other test data and his ability to openly
> discuss his difficulties and admit to unflattering aspects of himself
> and his past during his interview.

(Id., 9)  And finally, Dr. Marshall goes on to say the following regarding his desire
for treatment:

> With regard to treatment, Mr. Scott's response style suggests that he
> is interested in and motivated for treatment **and he appears even
> more motivated for treatment when compared to a normative
> sample**. His responses suggest an acknowledgement of important
> problems and the perception of a need for help in dealing with these
> problems. He reports a positive attitude towards the possibility of
> personal change, the value of therapy, and the importance of

personal responsibility.

(Id., 8. Emphasis added).

These positive qualities that his family and friends describe in their letters— honesty, remorse, and a desire to change— are not simply words of well-meaning friends and family, but are confirmed by the psychological testing. It seems clear that these qualities, coupled with some effective mental health and sex offender treatment that Mr. Scott desperately desires, should hopefully give this Court comfort that he will be successful and will not reoffend once released from a lengthy prison term of fifteen years.

### The Sentencing Guidelines In Child Pornography Cases Are Universally Recognized as Inappropriately Harsh and Contain Upward Enhancements That Do Nothing to Distinguish Between Defendants Based on Culpability.

Section 3553(a)(4) requires consideration of the advisory guideline. But the applicable guideline in this case is deeply flawed. In 2012, the United States Sentencing Commission released a report to Congress on the child pornography guidelines for non-production offenders. *See* U.S. Sent'g Comm'n, *Report to the Congress: Federal Child Pornography Offenses* (2012) ("*Report*"). That report states:

> The Commission believes that the current non-production guideline warrants revision in view of its outdated and disproportionate enhancements related to offenders' collecting behavior…. The current guideline produces overly severe sentencing ranges for some offenders.

*Report*, xxi.

The Commission accepts that, "as a result of recent changes in the computer and Internet technologies that typical non-production offenders use, *the existing sentencing scheme in non-production cases no longer adequately distinguishes among offenders based on their degrees of culpability*." *Id.* at ii, 323 (emphasis added).

Perhaps for that reason, since the guidelines became advisory in 2005 "there has been a

steadily decreasing rate of sentences imposed within the applicable guideline ranges in non-production cases." *Id.*, at ii. This trend indicates "that a growing number of courts believe that ***the current sentencing scheme in non-production offenses is overly severe***." *Id.* (emphasis added). Indeed, a 2010 survey of federal district court judges conducted by the Sentencing Commission revealed that 69% of judges see the child pornography guidelines as inappropriately "too high" in receipt cases like this. U.S. Sent'g Comm'n, *Results of Survey of United States District Judges Jan. 2010 Through Mar. 2010*, Question 8: Appropriateness of Guideline Ranges (2010), *available at* http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/surveys/20100608_Judge_Survey.pdf (last accessed Jan. 9, 2017).

The Commission explained that because the enhancements for computer use and type and volume of images "now apply to most offenders," the guideline "fail[s] to differentiate among offenders in terms of their culpability." *Report* at iii, xi; *id.* at 209, 323. It explained that "technological changes have resulted in exponential increases in the volume and ready accessibility of child pornography, including many graphic sexual images involving very young victims, a genre of child pornography that previously was not widely circulated." *Id.* at 6.

Because "sentencing enhancements that originally were intended to provide additional proportional punishment for aggravating conduct now routinely apply to the vast majority of offenders," *id.* at xi, the "current guideline does not adequately distinguish among offenders regarding their culpability for their collecting behaviors," *id.* at 323. "As a result, the cumulative enhancements addressing the content and volume of images possessed, "in addition to base offense levels of 18 or 22, result in guideline ranges that are overly severe for some offenders in view of the nature of their collecting behavior." *Id.*

The Commission illustrated the problem:

> Non-production child pornography offenses have become almost exclusively Internet-enabled crimes; the typical offender today uses modern Internet-based technologies such as peer-to-peer ("P2P") file-sharing programs that were just emerging only a decade ago and that now facilitate large collections of child pornography. The typical offender's collection not only has grown in volume but also contains a wide variety of graphic sexual images (including images of very young victims), which are now readily available on the Internet. **As a result, four of the of six sentencing enhancements in § 2G2.2 — those relating to computer usage and the type and volume of images possessed by offenders, which together account for 13 offense levels — now apply to most offenders and, thus, fail to differentiate among offenders in terms of their culpability. These enhancements originally were promulgated in an earlier technological era, when such factors better served to distinguish among offenders.** Indeed, most of the enhancements in § 2G2.2, in their current or antecedent versions, were promulgated when the typical offender obtained child pornography in printed form in the mail.

*Id.* at iii. (emphasis added).

The Commission's lengthy report constitutes a scathing critique of the child pornography guideline by the very group that authored it. Guideline § 2G2.2 is—by the Sentencing Commission's own account—unworthy of serious consideration. And at least one judge in this Division has explicitly adopted the Commission's assessment. *United States v. Coffey,* Case No. 2:16cr54, ECF No. 34 (E.D. Va. Nov. 15, 2016) (Doumar, J.).

Here, the Presentence Report calculates Mr. Scott's advisory guideline range to be at 360-480 months of imprisonment (restricted). *See* PSR, ¶ 81. Without the enhancements that the Commission has called into question, Mr. Scott's total offense level would be reduced from 39 to 26 and his guideline range would be 92-115 months. *See* Report at iii, xi, 6, 313. Notably, this *includes* a five-level enhancement for engaging in a pattern of activity involving sexual abuse and thus reflects the increased punishment range for conduct that is actually aggravating. *See* § 2G2.2(b)(5); *see also* PSR ¶ 21. The fifteen year sentence that the defense is requesting is

more than five years higher than this guideline range.

## THE STATUTORY FRAMEWORK

The overriding principle and basic mandate of 3553(a) requires district courts to impose a sentence sufficient, but not greater than necessary, to comply with the four purposes of sentencing set forth in Section 3553(a)(2): retribution ("to reflect the seriousness of the offense, to promote respect for the law, and to provide a just punishment"), deterrence, incapacitation ("to protect the public from further crimes"), and rehabilitation ("to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"). The sufficient-but-not-greater-than-necessary requirement is not just another factor to be considered along with the others set forth in § 3553(a), but instead, sets an independent limit on the sentence.

When imposing a sentence, none of the sentencing factors are to be given greater weight than the other factors. The law must "tak[e] into account the real conduct and circumstances involved in sentencing," as well as the defendant's personal history and characteristics. *See Gall v. United States*, 552 U.S. 38, 54 (2007); *see also* 18 U.S.C. § 3553(a)(1). Additionally, the Court is to consider the kinds of sentences available, the guideline range, the need to avoid unwarranted sentencing disparities, and the need for restitution.

### A Sentence of Not More Than Fifteen Years Is Necessary To Avoid Unwarranted Sentencing Disparities under § 3553(a)(6).

This Court must consider the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Here, the need to avoid disparity between Mr. Scott and non-production child pornography defendants generally warrants a below-guideline sentence. *Cf. United States v. White*, 620 F.3d 401, 415 (4th Cir. 2010) (citing § 3553(a)(6) and noting that courts "may consider

relevant national and local data and similarly situated defendants to promote uniformity in sentencing").

All around the country, non-production child pornography defendants are receiving below-guidelines sentences at unmatched rates. "In recent years, defendants sentenced under the non-production child pornography guidelines have received sentences outside of the applicable guideline ranges more frequently than defendants in all other major types of federal criminal cases." *Report*, 7. Indeed, in fiscal year 2011, less than one-third of non-production child pornography defendants received a guideline sentence. *Id.* Given the widespread rejection of the guidelines as being too harsh in this context, this Court cannot assume that the advisory guidelines reflect the national reality of what sentences are actually imposed in similar cases. So, in applying § 3553(a)(6) here, the Court cannot rely on the conventional wisdom that "the Guidelines themselves represent the best indication of national sentencing practices." *See United States v. Houston*, 529 F.3d 743, 752 (6th Cir. 2008). With respect to child pornography, they empirically do not. Thus, a sentence within (or near) the guidelines range risks creating an unwarranted disparity between Mr. Scott and other similarly situated defendants.

Moreover, other defendants in this district are regularly receiving sentences well below the guidelines for non-production offenses. In two recent receipt cases, this Court sentenced defendants to 6 years' imprisonment. *See United States v. Justin Alexander Clark*, Case No. 2:15cr150 (E.D. Va. Sept. 6, 2016); *United States v. William Clark*, Case No. 2:15cr87 (E.D. Va. Mar. 22, 2016); *see also United States v. Liesman*, Case No. 4:12cr108 (E.D. Va. Sept. 20, 2013) (sentencing defendant to 60 months for receipt of child pornography). In a recent case, Judge Morgan imposed the mandatory minimum term of five years for an Army veteran with no criminal history. *See United States v. Reno Lee Singleton*, Jr., Case No. 2:16cr24 (E.D. Va. Oct. 25, 2016).

To be sure, Mr. Scott's admission of a prior incident of contact and his prior conviction for indecent liberties makes this case more aggravating that those listed above and for that reason a higher sentence is appropriate. But those cases still stand for the proposition that the guidelines in child pornography cases are not an appropriate baseline.

In another recent case in this Division, a defendant received the same five-level enhancement for having engaged in a pattern of sexual abuse or exploitation of a minor. In that case, the defendant was convicted of two counts of receipt and thus faced a statutory maximum of 40 years. He received a sentence of 144 months—well below the advisory guidelines range. *See United States v. Jose Javier Hernandez*, Case No. 4:15cr38 (E.D. Va. Apr. 11, 2016).

In another case, the defendant engaged in inappropriate "chats" with an undercover agent he believed to be a minor and then sent that "minor" child pornography. When confronted by law enforcement, the defendant admitted that he had "engaged in sexual relationships with all three of his daughters (who are now adults) when they were minors." Gov't. Position on Sentencing, at 2 in *United States v. John Bright*, Case No. 1:09cr119 (E.D. Va. June 5, 2009), ECF No. 20. The defendant in *Bright* was sentenced to 97 months of imprisonment. Case No. 1:09cr119, ECF No. 23.

In *United States v. Neilssen*, the Fourth Circuit held that the pattern-of-abuse enhancement was correctly applied by the district court based on the defendant's prior "sexual abuse of his daughter and his sister." *United States v. Neilssen*, 136 F.3d 965, 971 (4th Cir. 1998). The Fourth Circuit remanded for resentencing based on another issue. *Id.* The District Court then resentenced Mr. Neilssen to 120 months' imprisonment for distributing and reproducing child pornography after applying the pattern-of-abuse enhancement at issue here. *See United States v. Neilssen*, Case No. 5:96cr66 (E.D.N.C. Oct. 15, 1998). That was a distribution case in which the defendant "took

sexually explicit photographs of his daughter on one occasion and caused another man to do so on a separate occasion." *Neilssen*, 136 F.3d at 971. He received a sentence of ten years.

Even in cases where the pattern-of-abuse enhancement is applied, sentences below ten years are commonplace in the Fourth Circuit. *See, e.g., United States v. Baker*, No. 09-4021, 2009 WL 3698577, at *1 (4th Cir. Nov. 6, 2009) (affirming 108-month sentence in non-production child pornography case when district court correctly applied pattern-of-abuse enhancement)[10]; *United States v. Hubbard*, 227 F. App'x 224, 228 (4th Cir. 2007) (affirming 87-month sentence in receipt case when district court correctly applied pattern enhancement because defendant molested his ex-girlfriend's two young sons); *United States v. Padgett*, 50 F. App'x 125, 126 (4th Cir. 2002) (affirming 108-month sentence in distribution cases where pattern enhancement applied)[11]; *United States v. Kramer*, Case No. 3:12cr171 (W.D.N.C. Dec. 3, 2013) (sentencing defendant to 120 months' imprisonment after applying pattern-of-abuse enhancement based on three prior convictions for taking indecent liberties with a child).[12]

Finally, in a very recent case in this Division, Judge Mark S. Davis sentenced a defendant to sixteen years for receipt of child pornography where there was an admission of prior hands-on offenses. See *United States v. Jerome Frostman*, Case No. 4:16cr55 (E.D. Va. January 25, 2017). Unlike Mr. Scott, however, Mr. Frostman did not suffer from extreme mental illness that went untreated for decades and did not endure and witness the abuse that Bruce did as a young child.

Such sentences are also commonplace in other parts of the country. *See, e.g., United States*

---

[10] The applicability of the pattern-of-abuse enhancement is discussed in the subsequent § 2255 opinion. *See Baker v. United States*, No. 3:07-CR-435, 2011 WL 3841690, at *14 (E.D. Va. Aug. 30, 2011), *aff'd*, 477 F. App'x 144 (4th Cir. 2012).
[11] Although the Fourth Circuit affirmed the sentence, the Fourth Circuit opinion does not state what the sentence was. The district court judgment states the sentence. *See United States v. Padgett*, Case No. 9:99cr457 (D.S.C. Nov. 3, 2000).
[12] *See also Kramer v. United States*, No. 3:12-CR-171-RJC-1, 2016 WL 55290, at *2 (W.D.N.C. Jan. 5, 2016) (discussing facts of underlying case in § 2255 opinion).

*v. Burns*, 834 F.3d 887, 890 (8th Cir. 2016) (affirming 97-month sentence when pattern-of-abuse enhancement applied because defendant "admitted to 'inappropriately touching' his minor daughter on several occasions, which included reaching into her pants to her pubic hair"); *United States v. Lucero*, 747 F.3d 1242, 1252 (10th Cir. 2014) (affirming 78-month sentence when pattern-of-abuse enhancement properly applied based on defendant's molestation of his nieces); *United States v. Reynolds*, 526 F. App'x 76, 77 (2d Cir. 2013) (affirming 102-month sentence for defendant who received pattern enhancement for prior acts of molestation); *United States v. Bacon*, 646 F.3d 218, 221 (5th Cir. 2011) (affirming 120-month sentence when district court correctly applied pattern enhancement based on defendant's "admitted molestation of two of his daughters"); *United States v. Williams*, 183 F. App'x 246, 247 (3d Cir. 2006) (affirming 71-month sentence with pattern enhancement); *United States v. Assiter*, 93 F. App'x 655, 656 (5th Cir. 2004) (finding that pattern enhancement was correctly applied and affirming sentence of 51 months in possession case); *United States v. Neal*, 249 F.3d 1251, 1254 (10th Cir. 2001) (affirming application of pattern enhancement and 51-month sentence); *United States v. Lovaas*, 241 F.3d 900, 901 (7th Cir. 2001) (affirming 87-month sentence when pattern-of-abuse enhancement was correctly applied based on defendant's prior sexual abuse of at least three boys).

Based on all of the cases cited above, a sentence of fifteen years for Bruce Scott would not create an unwarranted disparity, yet would take into account his unique history and characteristics.

### More Than Fifteen Years' Incarceration Is Greater Than Necessary to Achieve Specific Deterrence and Protect the Public.

An extended prison sentence of more than fifteen years is not necessary to protect the public from any future crimes by Mr. Scott. Anything longer cannot be justified on specific deterrence grounds because lengthier prison sentences do not achieve better recidivism rates. This Court could best mitigate Mr. Scott's risk of reoffending by ordering sex offender treatment,

psychiatric evaluation and treatment, and close supervision. But there is no evidence to support the proposition that increasing the time in prison will lower his risk of recidivism.

**Fifteen Years' Incarceration Is Sufficient to Achieve General Deterrence**.

A sentence of incarceration for fifteen years would be more than sufficient to achieve general deterrence. Research indicates that increases in the severity of punishment are far less important to producing deterrent effects than the certainty of punishment (if severity is relevant at all).[13] In May of 2016, even the Department of Justice confessed in its publication on deterrence that "[i]ncreasing the severity of punishment does little to deter crime," acknowledging that "[l]aws and policies designed to deter crime by focusing mainly on increasing the severity of punishment are ineffective."[14]

Virtually no data suggest that harsher sentences achieve general deterrence better than moderate sentences.[15] Indeed, "[t]he findings regarding general deterrence are relatively settled":

> [T]here is insufficient evidence to support a direct correlation between higher penalties and a reduction in the crime rate.… It is counter-intuitive to suggest that higher penalties will not reduce the crime rate. However, the evidence is relatively definitive.[16]

General deterrence "does not require a particularly burdensome penalty, merely one that people would seek to avoid."[17] Certainly anyone would 'seek to avoid' a fifteen year term of imprisonment. Thus, a sentence exceeding fifteen years is greater than that necessary to promote general deterrence in this case. See § 3553(a).

---

[13] *See* Valerie Wright, *Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment*, The Sentencing Project, at 1 (Nov. 2010), *available at* http://www.sentencingproject.org/doc/Deterrence%20Briefing%20.pdf (last accessed Jan. 9, 2017).
[14] U.S. Dept. of Justice, *National Institute of Justice Five Things About Deterrence* (May 2016), *available at* https://www.ncjrs.gov/pdffiles1/nij/247350.pdf (last accessed Jan. 9, 2017).
[15] *See* Anthony N. Doob & Cheryl Marie Webster, *Sentence Severity and Crime: Accepting the Null Hypothesis*, 30 Crime & Just. 143, 187 (2003).
[16] Mirko Bagaric, *A Rational Theory of Mitigation and Aggravation in Sentencing: Why Less Is More When It Comes to Punishing Criminals*, 62 Buff. L. Rev. 1159, 1202-03 (2014) (footnotes omitted).
[17] *Id.* at 1205.

## CONCLUSION

With the *correct treatment*, including sex offender, substance abuse and individualized psychotherapy, Bruce Scott can be a prosperous and productive member of society who will not reoffend. As Dr. Marshall indicated, to date he has not learned how to form healthy relationships in part due to the abuse and neglected he experienced at a young age, but the future can be different with the proper treatment and the appropriate supervision. Bruce deserves a chance to get the help he needs and move forward, no matter what terrible choices he has made in the past. The fifteen-year sentence requested by the defense will give him more than enough time to get effective treatment in all of these areas, obtain educational and vocational opportunities and certifications, and make a plan for his future, all while offering a severe and firm punishment for his criminal conduct. Finally, Mr. Scott and his family respectfully request that he be sentenced to a facility as close to home as possible.

Respectfully submitted,

Bruce Lee Scott

By: /s/_____
Amanda C. Conner
VSB # 88317
Attorney for Bruce Lee Scott
Office of the Federal Public Defender
150 Boush Street, Suite 403
Norfolk, Virginia 23510
(757) 457-0816
(757) 457-0880 (telefax)
amanda_conner@fd.org

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on the 2nd day of February, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Randy Carl Stoker
United States Attorney's Office - Norfolk
101 W Main St
Suite 8000
Norfolk, VA 23510
(757) 441-6331
Fax: (757) 441-6689
Email: randy.stoker@usdoj.gov

By:_____/s/_____

Amanda C. Conner
VSB # 88317
Attorney for Bruce Lee Scott
Office of the Federal Public Defender
150 Boush Street, Suite 403
Norfolk, Virginia 23510
(757) 457-0816
(757) 457-0880 (telefax)
amanda_conner@fd.org